Donald J. Kennedy
Laura Anne Reeds
Carter Ledyard & Milburn LLP
Two Wall Street
New York, New York 10005-2072
Tel. No. 212-238-8707
Attorneys for Plaintiff
AS Klaveness Chartering



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

JUDGE SAND

AS Klaveness Chartering

                    Plaintiff,

           - against -

Tarsus Shipping Ltd.

                  Defendant.

-------------------------------------------------------------X

**07 Civ.** CIV 9230

ECF CASE

VERIFIED COMPLAINT

Plaintiff AS Klaveness Chartering ("Klaveness" or "Plaintiff"), by and through its attorneys, Carter Ledyard & Milburn LLP, as and for its Verified Complaint against the Defendant, Tarsus Shipping Ltd. ("Tarsus" or "Defendant") alleges:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.      At all times material to this action, Plaintiff was, and still is, a foreign company duly organized and operating under the laws of the Kingdom of Norway.

1

3.      Klaveness was, at all material times, the charterers of the M/V Tarsus (the "Vessel").

4.      Tarsus is the owners of the Vessel and upon information and belief, Tarsus was, and still is, a foreign corporation or other business entity organized under, and existing by virtue of foreign laws, with a registered office at Valletta, Malta and with a principal place of business in Istanbul, Turkey.

5.      There was a time charter party dated August 4, 2006, for the M/V Tarsus between Klaveness and Tarsus for a period of about 11 to 13 months at a rate of hire of $23,500 per day (the "Charter Party") (Ex. 1).  Clause 17 of the Charter Party and the Dispute Resolution Clause of the "Additional Clauses" to the Charter Party provide for arbitration of disputes in London in accordance with English law.

6.      Klaveness and Bulkhandling Handymax AS ("Bulkhandling") entered into a Pool Participation Agreement dated August 4, 2006 ("Pool Agreement") for the purpose of employing the Vessel.  Pursuant to the Pool Agreement, Bulkhandling and Tongli Shipping Co. Ltd. ("Tongli") entered into a time charter dated September 12, 2007 for the M/V Tarsus ("Subcharter") for the carriage of a cargo of nickel ore at a rate of hire $59,500 per day for a voyage from Indonesia/Philippines to China.

7.      The Vessel was directed to proceed to first loading port of Mornopo, Indonesia to load nickel ore and a dispute arose between the owners of the Vessel, Tarsus and Tongli as to whether the cargo met the safe moisture standards and was in a fit state to load.  The Vessel did not load at Mornopo but proceeded to the second loading port of Tanjung Buli, Indonesia where a similar problem arose.  Ultimately, on September 25,

2007, Tongli asserted that Bulkhandling was in repudiatory breach of the Subcharter, terminated the Subcharter and asserted a claim in the amount of $4,500,000 against Bulkhandling which claim has been asserted in turn against Klaveness. Bulkhandling has an additional independent claim against Klaveness in the amount of $453,090 for breach of the Subcharter.

8.      Klaveness has incurred damages arising out of Tarsus's breach of the Charter Party, including Tarsus' refusal to permit the Vessel to load nickel ore at the ports of Mornopo and Tanjung Buli, in the net amount of $946,327.

9.      However, Tarsus has failed and refused to satisfy the amount due to Plaintiff as a result of Tarsus's breach of the Charter Party.

10.     Costs and attorneys' fees are routinely awarded to the prevailing party under English Arbitration Law.  As best as can now be estimated, Plaintiff expects to recover the following amounts in arbitration.

| | | |
|---|---|---|
| A. | On the principal claim: | $5,899,417 |
| B. | Attorneys' fees and costs: | $600,000 |
| | **Total** | $6,499,417 |

11.     The Defendant Tarsus cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

12.     Upon information and belief, Tarsus has, or will have during the pendency of this action, tangible or intangible property within this District and subject to the

jurisdiction of this Court, held in the hands of garnishees including, but not limited to, American Express Bank, Bank of America, N.A., Bank of New York, Barclay's Bank, Citibank, N.A., Deutsche Bank Trust Co. Americas, Fortis, HSBC Bank USA, N.A., JPMorgan Chase Bank, N.A., La Salle Bank, N.A., Standard Chartered Bank, USB AG, U.S. Bank N.A., Wachovia Bank, N.A. and/or Wells Fargo Bank, N.A. which is due and owing to the Plaintiff.

13.     Klaveness seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of Tarsus held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant, compelling them to arbitrate the claims asserted by Klaveness, and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendant Tarsus, citing it to appear and answer under oath all the matters alleged in the Verified Complaint.

B.    That since the Defendant Tarsus cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to, American Express Bank, Bank of America, N.A., Bank of New York, Barclay's Bank, Citibank, N.A., Deutsche Bank Trust Co. Americas, Fortis, HSBC Bank USA, N.A., JPMorgan Chase Bank, N.A., La Salle Bank, N.A., Standard Chartered Bank, USB AG, U.S. Bank N.A., Wachovia Bank, N.A. and/or Wells Fargo Bank, N.A. which is due and owing to the Plaintiff, in the amount of $6,499,417 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Verified Complaint.

C.    That this Court recognize and confirm any arbitration award or judgment rendered on Plaintiff's claims herein as a Judgment of this Court.

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

E.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: October 15, 2007
        New York, New York

                        Carter Ledyard & Milburn LLP
                        Attorneys for Plaintiff,
                        AS Klaveness Chartering

                By:    _____
                        Donald J. Kennedy
                        Laura Anne Reeds
                        Two Wall Street
                        New York, New York  10005-2072
                        Tel. 212-732-3200
                        Fax: 212-732-3232

## ATTORNEY'S VERIFICATION

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

1.      My name is Donald J. Kennedy.

2.      I am over 18 years of age, of sound mind, capable of making this verification, and fully competent to testify to all matters stated herein.

3.      I am a partner in the firm of Carter Ledyard & Milburn LLP, attorneys for the Plaintiff

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated: New York, New York
       October 15, 2007

Donald J. Kennedy

# EXHIBIT 1



# Time Charter

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



1  **This Charter Party**, made and concluded in *London* ............................................................... *4th* day of *August* ......................... 19 *2006*
2  Between *Tarsus Shipping Ltd* .........................................................................................................................................................
3  Owners of the good *Malta Flag* .................. ~~Steamship/Motorship~~ *"TARSUS"* ....................................................... of .......................
4  of ......................... ~~tons gross register, and~~ ......................... ~~tons net register, having engines of~~ ......................... ~~indicated horse-power~~
5  ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~
6  ~~at ......................... of about ......................... cubic feet bale capacity, and about ......................... tons of 2240 lbs.~~
7  ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~
8  ~~allowing a minimum of fifty tons) on a draft of ......................... feet ......................... inches on ......................... Summer freeboard, inclusive of permanent bunkers,~~
9  ~~which are of the capacity of about ......................... tons of fuel, and capable of steaming, fully laden, under good weather~~
10 ~~conditions about ......................... knots on a consumption of about ......................... tons of best Welsh coal—best grade fuel oil—best grade Diesel oil;~~
11 now *trading* ..............................................................................................................................................................................................
12 ........................................... and *AS Klaveness Chartering* ......................... Charterers of the City of *Oslo, Norway.*

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 about *11 to 13 months* period charter *(about means +/- 15 days in Charterers option) via ice free safe port(s), safe berth(s),*
15 *safe anchorage(s) always afloat, always accessible, always within Institute Warranty Limits* within below mentioned trading limits.
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations*
18 *hereunder.*
18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port Aden - Japan range anytime day or*
19 *night Sundays and Holidays included (intention Chittagong, Bangladesh)* ..................................................................................................
20 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21 the Charterers may direct. ~~If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be
22 ready to receive *any permissible* cargo *under this Charter Party* with clean-swept holds *(See Clause 59)* and tight, staunch, strong and in every way
23 fitted for the service, having water ballast, *cranes* winches and
23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* winches at once and the same
24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25 dise, including petroleum or its products, in proper containers, excluding *See Clause 55* ..........................................................................
26 (vessel is not to be employed in the carriage of Live Stock, ~~but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27 ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29 ~~Mexico, and/or South America~~ ......................................................................................................................... ~~and/or Europe~~
30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32 ..............................................................................................................................................................................................................
33 ..............................................................................................................................................................................................................
35 as the Charterers or their Agents shall direct, on the following conditions:
36  1.  That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; *and all other charges*
   *relating to the Master, Officers and Crew* shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment for and during the service *with all inspection certificates*
   *necessary to comply with current regulations at ports of call for and during the service.*
39  2.  That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, *compulsory pilotages, boatage on*
   *Charterers' business, seaways, rivers, canal expenses,* Agencies, Commissions,
40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44 ~~of six months or more.~~
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.
48  3.  ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ......................... tons and not more than~~
50 ~~......................... tons and to be re-delivered with not less than ......................... tons and not more than~~
51 ......................... ~~tons.~~ *See Clause 42.*
51  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD23,500 daily including overtime payable every 15*
52 *days in advance* .................. ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~

SHIPBROKERS
MAERSK BROKER

53 stores, ~~or~~ .......................................................... ~~summer freeboard per Calender Month~~, commencing on and from the day of her delivery ~~(U.T.)~~ ~~aforesaid~~ and at

54 and after the same rate for any part of a *day* ~~month~~; hire to continue until the hour of the day of her re-delivery in like good ~~order~~ and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) or *dropping last outward sea pilot passing one safe port port for Charterers* option

56 *anytime day or night Sundays and Holidays included within following ranges: a) Singapore / Japan range or b) Skaw / full mediterranean including Black Sea / UK / Ireland or c) Boston / Bahia Blanca range including full Caribbean Sea/Mexican Gulf / north coast of South America or d) Vancouver British Columbia / Valparaiso range. Not less than 25 days prior to redelivery Charterers to declare intended redelivery range. Actual redelivery notice with the name of redelivery port 20/15/10 approx + 7/5/3/2/1 days definite notice*

*unless otherwise mutually agreed.* ~~Charterers are to give Owners not less than~~ ........................................................................................................days

57 ~~notice of vessels expected date of re-delivery and probable port.~~ *See Clause 56*

58 5. Payment of said hire to be made in New York in cash in United States Currency, *every 15 days* ~~semi-monthly~~ in advance, and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, *(See also Clause 31)* ~~or bank guarantee, or on any breach of this Charter Party~~, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count *as from vessel's delivery* ~~7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain *subject to Owners' approval*, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70 ~~lie aground.~~

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. *No passengers allowed.* ~~Charterers have the privilege of passengers as far as accommodation allow, Charterers~~

74 ~~paying Owners~~ .......................................................... ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow *and discharge*, and trim *dunnage, lash, secure, unleash, tally and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or is to authorise Charterers or their Agents in writing to sign* Bills of Lading for

79 cargo as presented, in conformity with Mate's or ~~Tally Clerk's~~ receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and' same fare as provided for Captain's table, Charterers paying at the

84 rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorised by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying at the ~~current rate per meal~~, for all such victualling *as per Clause 72.*

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct *deck and engine* Log of the voyage *(deck and engine logs are issued in Turkish if required same to be translated in English by the Master of vessel free of charge)* or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91 13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ..........................................................

92 ..........................................................

93 ~~on giving written notice thereof to the Owners or their Agents~~ .......................................................... ~~days previous to the expiration of the first named term, or any declared option.~~

94 14. That if required by Charterers, time not to commence before *10th September 2006* .......................................................... and should vessel

95 not have given written notice of readiness on or before *1st October 2006* .......................................................... but not later than 4 p.m. Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness *but time to count only from final reconfirmation. Should vessel not be delivered by the above agreed dates, the Charterers to have the option of cancelling. If the vessel cannot be delivered by the cancelling date, the Charterers, if required to declare within 24 hours after receiving notice thereof whether they cancel or will take delivery of the vessel. Laycan to be narrowed to 10 days and inform name of delivery port, 10 days prior to the first day of layday. Vessel itinerary: etb Necochea: 03.08.06, etd Necochea : 05.08.06, eta Chitagong: 04.09.06, etd Chitagong: 13.09.06 all going well weather permitting*

97 15. That in the event of the loss of time from ~~deficiency~~, sickness, strike, accident or default of Master, Officers or Crew ~~of men~~ *or* deficiency *stores, fire, breakdown or damages to hull, machinery or equipment,*

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; *and all extra expenses directly including bunkers consumed during period of suspended hire shall be for Owners' account* and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra expenses shall be deducted from the hire.

102    16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or ~~being last heard of~~) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107    17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *two* ~~three~~ persons at *London* ~~New York~~,
108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of *an Umpire* ~~any two of them~~, shall be final, and for
109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be ~~commercial~~ *shipping men conversant with*
*shipping matters. Any dispute to be referred to English High Court in London, English Law to apply. For claims up to*
110  *USD50,000.00, the Small Claims Procedure to apply.*

    18.  That the Owners shall have a lien upon all cargoes, and all sub-freights, *hire and sub-hire* for any amounts due under this Charter, including
General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.

114    19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, *in London* according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116  York-Antwerp Rules *1974 as amended 1994 or any amendments thereto in London* 1924, ~~at such port or place in the United States as may be~~
~~selected by the carrier, and as to matters not provided for by these~~

117  ~~Rules, according to the laws and usages at the port of *London* New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118  ~~United States money at the rate prevailing on the date made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Any Average agreement or~~
120  ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125  ~~United States money.~~

126  ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers~~ *Charter Party not to contribute to General Average.*

132    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133    20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed as to quantity, and the
134  cost of replacing same, to be allowed by Owners.

135    21.  *See Clause 60* ~~That the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138

139

140  ~~22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account~~ Owners also to provide on the vessel *power and electric lights*
*sufficient for night work in all holds, simultaneously free of expense to Charterers (See Clause 29)* ~~lanterns and oil for~~
~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board at Charterers' expense. The~~
~~Charterers to have the use of any gear on board the vessel.~~

145    23.  Vessel to work night and day, if required by Charterers, and all *cranes* ~~winches~~ to be at Charterers' disposal during loading and discharging; *No*
*winchmen, cranemen from crew, all winchmen / cranemen to be provided and paid by Charterers*
146  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~deck-hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148  ~~port or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149  ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150  ~~thereby.~~

151  ~~24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152  ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153  ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154  ~~of which are to be included in all bills of lading issued hereunder~~

155  ~~U. S. A. Clause Paramount~~

156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160  ~~Both to Blame Collision Clause~~

161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

166  owners as part of their claim against the carrying ship or carrier.
167  25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging.
170  26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading for their own account.
172  27.  A commission of 2 1/2 *1.25* per cent is payable by the Vessel and Owners to
173  *Maersk Broker (UK) Ltd.* ............................................................................................................................................
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175  28.  An address commission of 2 1/2 *3.75* per cent payable to *Charterers* .......................................... on the hire earned and paid under this Charter.

For the Owners as per written authority dated 8th September 2006

13.9.06

Maersk Broker (UK) Limited, as Agents only, to the Owners

For the Charterers as per written authority dated 13th September 2006

13.9.06

Maersk Broker (UK) Limited, as Agents only, to the Charterers

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006



29.  **Vessel's Description**

As per the attached specifications.

30.  **Hull / Bottom Cleaning Clause**

If the vessel is in a port or idle at a safe place for more than 20 days, master will report vessel's hull fouled condition to Charterers. Owners are not responsible for reduction in speed and/or bunkers over consumption if such underperformance is made as a result of hull/bottom growing fouled. However, if requested by Charterers, owners will endeavor to carry out hull/bottom cleaning at a convenient port mutually agreed where the facilities are available at Charterers time and expenses. Charterers have no right to lodge a speed or bunker claim against the owners during the period of the vessel is in fouled condition even if hull/bottom cleaning done up until such time as vessel's next scheduled dry-dock.

31.  **On/Off-Hire Clause**

Referring to Lines 60 and 61, where there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omission of Charterers' employees, bankers or Agents, Charterers will have three banking days to rectify the failure. Where so rectified the payment shall stand as punctual and regular payment.

32.  Charterers to have the right to withhold from Charter hire during the period of this Charter amounts due to off-hire and Owners' disbursements, but properly substantiated. Charterers to have the right to withhold from last sufficient hire payments Owners' estimated advances and disbursements, including any fines and other accounts for Owners' account and also the value of the estimated quantity of bunkers on redelivery with proper substantiations.

33.  In the event of the vessel being boycotted by I.T.F. delayed or rendered inoperative by strikes, labour stoppages or by any other difficulties due to vessel's flag, ownership, crew terms of employment of Officers or crew, or any other vessel under the same ownership, all time lost is to be considered as off-hire and expenses directly incurred thereby to be for Owners' account.

34.  Should the vessel be seized by any authority or arrested at the suit of any party having or purporting to have a claim against or any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all directly related extra expenses incurred by Charterers during off-hire period which is proven by Charterers shall be for Owners' account, unless such seizure or arrest is occasioned by any personal act or omission or default of the Charterers or their Agents, or by reason of cargo carried.

35.  Any delay, expense and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers or by Charterers' servants and to be for Owners' account if caused by Master, Officers, crew or Owners' servants.

**ADDITIONAL CLAUSES**
**TO MV "TARSUS"**
**CHARTER PARTY DATED 4TH AUGUST 2006**

36.  Charterers to have the option to add any off-hire to the Charter period.

37.  Any time lost due to lack or proper documentation or equipment as per Clauses 45, 46, 47 and 48 or any breach of said clauses shall be treated as off-hire and all expenses incurred directly resulting from such failure shall be for Owners' account by reason of non-compliance with such regulations.

38.  **Hire**
     Owners' bank account details:

     Beneficiary : Tarsus Shipping Ltd.
     Bank       : Bayerische Hypo Und Vereinsbank / Hamburg
     Swift code : hyvedemmxxx
     Account no : 910102821
     Iban no    : de87 7002 0270 0910 1028 21
     Correspondent Bank: JP Morgan Chase Bank, New York

39.  If stevedores, Longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with Clause 46, or because of lack of said certificate(s), any time so lost shall be treated as off-hire and all extra expenses incurred directly resulting from such failure shall be for Owners' account.

40.  Should the vessel deviate or put back during a voyage contrary to the order or direction of the Charterers, or as permitted by this Charter, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All fuel used by the vessel while off-hire shall be for Owners' account.

41.  In addition to Master rendering all usual and customary service with ship's not limited to, the following services are included in hire and shall be rendered by Officers and crew any time day or night, without Charterers paying for such services:

     a  Raising and lowering of cranes and/or gangways in preparation for loading and discharging.

     b  Opening and closing of hatches in connection with loading and discharging, if port regulations permit.

     c  Closing and opening of hatches in the event of adverse weather conditions which may affect the condition of cargo carried on board during loading and discharging, if port regulations permit.

     d  Arranging for and preparing/stowing, rigging/unrigging of cargo equipment.

     e  Supervision for loading and discharging and everything related thereto.

     f  Maintaining sufficient electric power on all cranes whilst loading and discharging.

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

g   Shifting vessel during loading and discharging and shifting berths, however linesmen/pilotage/tugs, if any, to be for Charterers' account.

h   Docking and undocking in connection with loading/discharging cargo or bunkering.

i   Bunkering.

j   Officers and crew to shape up vessel's hatches and cranes as much as possible prior to arrival at loading and/or discharging places so as to permit immediate commencement of loading and/or discharging operations if weather permits.

k   Cleaning of holds/hatches between voyages - for payment see Clause 66.

42.   Bunkers on delivery to be about 800 / 950 mts IFO and about 80 / 100 mts MGO. Bunkers on redelivery to be same as on delivery.

Bunker prices both ends USD380 pmt IFO and USD 660 pmt MGO.

Charterers to pay bunkers on delivery value along with first hire on delivery.

Refer to clause 29 for vessel's bunker description/specs.

43.   Charterers to have the privilege to bunker vessel prior delivery, provided the bunkering does not interfere with Owners' operations.  Similar privilege is granted to Owners' prior redelivery.

44.   Owners warrant the vessel is eligible and equipped to bunker in the USA its territories and possessions and in all countries to which vessel is allowed to trade under this Charter.

45.   The Owners are to provide and keep on board valid deratisation exemption or fumigation certificates throughout the Charter period.  Deratisation shall always be for Owners' account, except for cargo.

46.   Throughout the period of the Charter vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, national and international regulations and all current requirements at all ports of call, Panama and Suez Canal included.

47.   For the carriage of grain in bulk, vessel to have on board throughout this Charter period valid documents and certificates issued by the classification society and/or national authority on the basis of the Solas 1974 Regulations and latest amendments thereto. The vessel is a fully grain fitted singledeck/selftrimming bulk carrier capable of loading and sailing with untrimmed ends in accordance with N.C.B. and U.S/Canadian Coastguard Regulations.

48.   Vessel is suitable for grab discharge and no cargo to be loaded in places inaccessible to grabs or in deeptanks.

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

**49. Cargo Claims/P&I Club**

Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association which is a member of the Group of International P&I Clubs for the duration of this Charter Party. Entry shall include, but not be limited to ordinary cover for cargo claims.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' and/or Charterers' liability could be involved under the terms of this Charter Party as the case may be, the Owners and/or the Charterers shall be asked to grant time extension for suit in each and every occurrence which should not be unreasonably withheld. The so granted extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims as between Owners and Charterers shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996 and its subsequent amendments.

Owners' P&I Club : West of England
Charterers' P&I Club: GARD, Arendal

<u>Oil Pollution</u>
Owners guarantee to provide and maintain during the entire time charter period, at their expense and carry onboard the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire timecharter period.

The Charterers shall in no case be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any consequential losses, damages or expenses.

**50.** Extra hull and machinery insurance, if any, owing to vessel's age and/or class and/or flag to be for Owners' account.

**51.** In the event of outbreak of war between any of the following countries: United States of America, the country of vessel's flag, CIS, The People's Republic of China, United Kingdom, Japan, France, Germany both Charterers and Owners have the option of canceling this Charter Party, provided no cargo on board.

It is understood that war means direct war between these nations and does not include local hostilities or civil war where any of the above countries support opposing sides. Owners shall not unreasonably take advantage of this Clause in case of limited local conflict.

**52.** The normal war risk insurance premium on the vessel's hull and machinery value are for Owners' account. War bonus to the Master, Officers and crew to be for Charterers' account.

4

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

53.   This Charter is subject to the New Jason Clause, New Both-to-Blame Collision Clause, P&I Club Bunkering Clause, Conwartime 2004 Clause, General Paramount Clause as attached, which are endeavoured to be incorporated in all Bills of Lading issued under this Charter.

Above clauses as attached to this Charter Party.

All Bills of Lading issued under this Charter will incorporate the General Paramount Clause as attached.

54.   **Trading Limits**

Clause as attached and Lebanon is excluded.

55.   **Cargo Exclusions**

As per attached however; Charterers will have option to load maximum 4 dirty cargo options during charter party period among petcoke / scrap (shredded + hms 1,2 only) / lead – zinc – copper concentrate / only 1 time rock salt (without lime washing) / only 1 time clinker.

Owners protecting dirty cargo clauses to be a part of charter party. Dirty cargoes will not be carried consecutively and will not be the last cargo.

56.   **Delivery/Redelivery Notices**

For delivery: estimated delivery notices 5/3/2/1 days definite notice.

57.   A joint on hire survey will be held at port of delivery. Charterers to appoint an independent surveyor acceptable to Owners who shall conduct a joint on-hire survey on vessel's condition and bunkers, the time to be for Owners' account, but cost to be equally shared by Owners and Charterers.

At port of redelivery Charterers and Owners to appoint one independent surveyor who shall conduct a joint off-hire survey on vessel's condition and bunkers. Such time used to be for Charterers' account, the cost to be equally shared by Charterers and Owners.

Charterers may at currency of the charter party conduct on-off hire and hold condition and hatch covers surveys when they sublet the vessel and Master/crew shall render assistance.

58.   **Drydock Clause**

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

No dry-docking except for emergency.

**59.  Holds On Delivery**

Vessel's cargo holds on delivery to be clean swept/washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects, free of salt, rust scale and previous cargo residues to satisfaction of independant surveyor. If vessel fails inspection the vessel to be placed off-hire from commencement time of survey until the vessel pass re-inspection and any direct expenses/time lost due to failure of survey to be for Owners' account.

**60.  Ballasting Clause**

Charterers have the right to instruct Master to utilise the vessel's maximum water ballast capacity and eventually to flood the only one ballast hold in order to bring down vessel height to get into position under loading and/or discharging appliances, however always in conformity to free board, stability and/or safety requirements.  When deballasting the flooded hold, time lost and risk for the deballasting and hold cleaning to be for Charterers' account and responsibility.

**61.**  Local time for laycan, GMT for hire calculations.

**62.  Bills of Lading Signature:**

Notwithstanding the provisions of clause 8, under owners standard authorization letter, Master and Owners to authorize Charterers and/or their agents to sign bill(s) of lading for and on behalf of the Master.

All bills of lading shall be without prejudice to this charter party and the Charterers shall indemnify the owners against all consequences or liabilities which may arise from any inconsistency between this charter party and any bills of lading signed by the Charterers or by their agents or by Master at their request.

Charterers shall fax the copies of signed bills of lading to owners as soon as possible, but in any event not later than two working days prior to vessel's arrival of discharging port that such bills of lading covered.

**LOI For Release Cargo:**

In case the original b/l not arrive in the discharging port in time, then Owners to release the entire cargo without presentation of the original b/l against Charterers loi which to be in Owners p and i club wording and format, signed by one authorized officer of Charterers indicating name and title with Charterers' official stamp.

The loi is to be faxed to Owners office latest two working days prior to vsl's arrival of d/port for Owners approval. In the event that Charterers are unable to fax the loi 2 working days prior to vessels arrival at disport(s) for Owners approval then Owners not to be responsible for any delays that might be incurred by failure to do so.

**63.  Double Banking Clause**

6

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

(a)    The Charterers shall have the right, where and which it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b)    The Charterers shall pay\z for and provide such assistance and equipment including fenders as per Master's satisfaction as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c)    Without prejudice to the generality of the Charterers rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do

(d)    The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(e)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

64.    Owners Protecting Clauses

For Scrap:
Charterers undertake that loading of first layers shredded scrap not to be released until very close to tank top and not to be dumped/dropped during loading. Sufficient quantity of shredded cargo to be loaded at each hold as a layer to protect tanktops against any damage. However shredded scrap can be loaded via conveyor belt i.e. can be dumped. (usual uswc)

For Clinker:
One shipment of clinker
Charterers will provide and paid required chemicals and equipment for ihc and cleaning of deck and hatches. Owners will not be responsible for hold cleanliness for hold surveys at subsequent fixtures.

For Petcoke:
Petcoke - non hazardous, non dangerous, non oily, calcined, green delayed type, Charterers will supply and pay for necessary chemicals for cleaning of holds / hatches.

Concentrates:

7

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

It is understood and agreed that only copper and zinc and lead concentrates to be allowed. Always excluding metal sulphide concentrates, provided following clause to apply:

1. Charterers hereby warrant that the cargo is non-corrosive and harmless subject to the imo regulations and allowed by the cargo exclusion of governing charter party.
2. Concentrates cargo shall always be loaded, stowed, carried and discharged in accordance with appropriate local and national regulations, and in full compliance with imo regulations.
3. An appropriate certificate shall be furnished to master, indicating the pre-shipment moisture contents, flow moisture point, actual transportable   moisture limit, stowage factor, and angle of repose, etc. (as defined by imo) on shipment.
4. After loading, cargo must be properly trimmed at Charterers time and expenses to the surveyor and master's satisfaction.

Salt - no lime washing

Soya bean meal is excluded cargo.


65.  The Owners will maintain the vessel's hatchcovers watertight.  All hatches are to be carefully tendered by crew to prevent leakage.  Should Master require ramneck or similar tape, then same to be for Owners' account.

66.  **Hold Cleaning Clause**

Charterers have the option to redeliver the vessel without cleaning holds by paying Owners USD4,000 lumpsum including dunnage, lashing, removal or disposal.

In the event that national/state regulations at discharge port do not allow vessel to dispose of dunnage/debris at sea, then Charterers to remain responsible for all dunnage/debris disposal/removal.

If required by Charterers, intermediate hold cleaning to be performed by vessel's crew provided that sufficient time is available and that the local labour and/or port regulations and weather conditions between previous final discharging port and subsequent loading port permits.

Although the master and crew are not responsible for the result of their hold cleaning and/or the acceptance of survey on hold condition (except at first loading port after delivery under this charter party), they shall do their best in cleaning cargo holds and other stained parts in order to make the vessel's cargo holds acceptable to surveyor/inspector for cargo loading.

Charterers to pay Owners USD 750 per hold used and USD 950 per hold used if loading petcoke, scrap, clinker, concentrade and salt excluding removal of dunnage and fittings, which to be removed by Charterers at their time/expense. It is also understood

8

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

that any fresh water and/or chemical required by vessel to carry out such cleaning to be supplied to the vessel at Charterers time and expense.

67.   Should any damage be caused to the vessel or her fittings by the Charterers or the stevedores, the Master shall notify in writing in English language within 24 hours of occurrence, or as soon as possible in case of hidden damage, to Charterers and Charterers' Agents, otherwise Charterers not to be held responsible.

In the event stevedores fail to settle stevedore damage claims, Charterers to intervene and actively assist Owners in settlement of such claims for damage to hull, machinery or apparel of the vessel resulting in negligence of the stevedores in loading and discharging the vessel.

For stevedore damage not visible when carrying scrap or steel, such notices to be given not later than on completion of discharge of cargo in question.

Owners/Master to immediately arrange in conjunction with Charterers' Agents or supercargo the damage to be surveyed by an independent surveyor and an estimate of repair costs given. Such damage survey expenses to be shared equally between Owners and Charterers and Charterers shall pay for such estimated cost of repairs. In any case any damage affecting class and/or seaworthiness should be made good by Charterers at Charterers' time and expenses before vessel sailing from the port concerned.

Charterers shall be ultimately responsible when stevedore company's fail to pay/repair any such damages including hidden ones.

68.   In the event of a disabled crane(s) and/or power to drive them and shore crane(s) required, Charterers have the option to hire same for Owners' account, vessel to remain on hire while shore crane operating. Owners are granted upto 9 hours for repairing before Charterers can exercise their option. Vessel to remain pro-rated off-hire until shore crane available and operating.

69.   **Owners' Option to Sell**

Owners' option to sell the vessel with the Timecharter attached subject to Charterers' approval of new Owners, such approval not to be unreasonably withheld.

70.   If the vessel's crew or vessel are caught smuggling narcotics into USA waters or ports, then this to be for Owners' responsibility. If the Charterers' Agents or servants are caught smuggling narcotics into USA waters or ports, then this to be the Charterers' responsibility.

71.   **Liabilities for Cargo**

Liability to third parties for cargo claims shall be shared by the Owners and the Charterers in accordance with Inter Club New York Produce Exchange Agreement

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

dated February 20th 1970 or any amendments thereto. Any cargo claim should be immediately referred to the other party with supporting documents for negotiation.

72.  **Entertainment**

The Charterers to pay USD1,500 lumpsum per 30 days or pro-rata for communication/ victualling /entertainment etc.

73.  Watchmen for vessel/crew to be Owners' account. Watchmen for cargoes and compulsory watcmen to be Charterers' account.

Compulsory watchmen ordered by port authorities due to nationality of crew to be for Owners' account.

74.  Charterers' Agents to handle ship's minor routine matters at cost without payment of fee by Owners except where such fees are compulsory, but Owners when necessary will appoint their own Agents at port of call to attend major Owners' matters.

75.  Any taxes and/or dues on vessel and/or cargo and hire (including any income tax levied on freight/hire by authorities at load or discharge port(s) to be for Charterers' account.

76.  Owners warrant that the vessel has not traded Israel and is not blacklisted by Arab countries and that the vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with U.S. Department of Commerce Office of International Trade (in accordance with valid regulations in accordance with US Authorities requirements).

77.  **Ocean Route Clause**

The Charterers may supply an independent weather routing company's advice to the Master, during the voyages specified by the Charterers. the master shall comply with the reporting procedure of the routing service. but it is understood that final routing is always at master's discretion for safety navigation. evidence of weather condition to be taken from the vessel's deck logs and independent weather bureau's reports. in the event of a consistent discrepancy between the deck logs and independent weather bureau's reports, the vessel's deck logs to be taken as ruling.

No deduction from hire to be made without owners agreement of Chaterers' written evidence of speed deficiency and any financial loss.

78.  Charterers to have the option of terminating this Charter in the event of vessel remaining off-hire for 30 days consecutive or more and may redeliver the vessel to Owners at any port or anchorage within trading limits.

No liability whatsoever shall attach to Charterers in the event of their exercising their option to terminate this Charter, provided the off-hire caused due to Owners/vessel's faults.

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

79.  **Redelivery**

See Lines 55/56.

80.  **ISM Clause**

From the date of coming into force of the International Safety Management (ISM) Code
in relation to the vessel and thereafter during the currency of this Charter Party, the
Owners shall procure that both the vessel and "The Company" (as defined by the ISM
Code) shall comply with the requirements of the ISM Code. Upon request the Owners
shall provide a copy of the relevant Document of Compliance (DOC) and Safety
Management Certificate (SMC) to the Charterers. Should Owners be unable to provide
same ISM Certificates within 5 days of request, then Charterers have the option of
cancelling the Charter unless the vessel already has cargo on board.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay
caused by failure on the part of the Owners or "The Company" to comply with the ISM
Code shall be for the Owners' account.

81.  Deleted

82.  Deleted.

83.  Deleted.

84.  "Year 2000 conformity" shall mean that neither performance nor functionality of
computer systems, electronic and electro-mechanical or similar equipment will be
affected by dates prior to or during the year 2000.

Without prejudice to their other rights, obligations and defenses under this Charter Party
including, where applicable, those of the Hague or Hague-Visby Rules, Owners and
Charterers, and in particular the Owners in respect of the vessel, shall exercise due
diligence in ensuring year 2000 conformity in so far as this has a bearing on the
performance of this Charter Party.

The vessel, the Owners, the management and the registration are in compliance with the
"Year 2000 Clause" throughout the duration of the whole Charter and at any port of call.

85.  Owners guarantee that vessel's hatchcovers are to be watertight all throughout this
Charter period and if any hatchcover found defective, same to be rectified at Owners'
time and expense to Charterers satisfaction. Charterers also have the right to carry out
hose test on all hatches at any time during this Charter.

86.  Deleted.

87.  Conwartime 2004 to apply

11

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

88.  Deleted.

89.  **ITF**

   Vessel is member of ITF Turkish equivalent, which is a member of ITF.

90.  **U.S. Security Clause**

   If the vessel calls in the United States, including any U.S. Territory, the following
   provisions shall apply with respect to any applicable security regulations or measures:

   Notwithstanding anything else contained in this Charter Party all costs or expenses
   arising out of or related to security regulations or measures required by any U.S.
   authority including, but not limited to, security guards, launch services, tug escorts, port
   security fees or taxes and inspections, shall be for the Charterers' account, unless such
   costs or expenses result solely from the Owners' negligence.

## PROTECTION & INDEMNITY BUNKERING CLAUSE

The vessel, in addition to all other liberties, shall have liberty as part of the contract voyage
and at any stage to proceed to any port or ports whatsoever, whether such ports are on or off
the direct and/or customary route or routes to the ports of lading or discharge named in this
Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full
capacity of fuel tanks, deep tanks and any other compartments in which oil can be carried,
whether such amount is or is not required for the chartered voyage.

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter
Party fails to be determined in accordance with the laws of the United Sates of America, the
following clause shall apply:-

## BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship
and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the
navigation or in the management of the ships, the Owners of the goods carried hereunder will
indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners
in so far as such loss or liability represents loss of or liability represents loss of or damage to or
any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-
carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered
by the other or non-carrying ship or her Owners as part of their claim against the carrying ship of
carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any
ship or ships or objects other than or in addition to, the colliding ships or objects are at fault in
respect to a collision or contract."

12

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL PARAMOUNT CLAUSE

The Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th August 1924, and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 2004

War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against

13

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

14

**ADDITIONAL CLAUSES**
**TO MV "TARSUS"**
**CHARTER PARTY DATED 4TH AUGUST 2006**

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

**ISPS Clause for Time Charter Parties**

A. (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

B. (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers

15

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

C.   Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

D.   If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**US Customs Advance Notification/AMS Clause for Time Charter Parties**

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)   Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b)  The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c)  If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

16

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

(d)   The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Canada Advance Commercial Information/ACI for Time Charter Parties**

For all vessels calling Canada should also fulfill ACI requirements.

(a)   If the Vessel loads or carries cargo destined for Canada or passing through Canadian ports in transit, Charterers shall comply with the current Canadian Customs and/or CBSA (Canada Border Services Agency) regulations (as per CN 542, CN 565) or any subsequent amendments thereto, and shall undertake the role of Carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i)     Obtain a Carrier Code
    ii)    File a Customs Bond (see section c)
    iii)   Provide the Owners with a prompt confirmation of i) and ii) above; and
    iv)    Submit a cargo declaration via ACI (Advance Commercial Information) facilities to the CBSA (Canada Border Services Agency) and provide the Owners at the same time with a copy thereof.

(b)   The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a), except where such failure results from the fault of Owners or their agents or employees. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire, except where such failure results from the fault of Owners or their agents or employees.

(c)   The Charterers agree to take responsibility for the fulfillment of Canadian requirements pertaining to the filing and utilization of a Customs Bond, if and where enforced by current and future relevant Canadian laws and regulations, throughout the duration of this charter party.

(d)   The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purposes of complying with ACI regulations put into effect by CBSA (Canada Border Services Agency) and/or an equivalent Canadian Authority in the future shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**ISPS/MTSA Clause For Time Charter Parties 2005**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of

17

**ADDITIONAL CLAUSES**
**TO MV "TARSUS"**
**CHARTER PARTY DATED 4ᵀᴴ AUGUST 2006**

SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Dispute Resolution Clause English Law, London Arbitration**

(a)  This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

18

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

19

ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

## Seaworthy Trim Clause

Charterers shall leave the Vessel in seaworthy trim and with cargo on board safely stowed to Master's satisfaction between loading berths/ports and between discharging berths/ports, respectively; any expenses resulting therefrom shall be for Charterers' account and any time used shall count.

## Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or

20

**ADDITIONAL CLAUSES
TO MV "TARSUS"
CHARTER PARTY DATED 4TH AUGUST 2006**

resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

21

# GEDEN LINES

## M/V TARSUS

[ REVISED As of  ;  10.JULY.2006 ]          Page          1 of 6

### Specification of Vessel

[ All Details About & WOG ]

|  |  |  |
|---|---|---|
| Type of Vessel | : | Single Decker Self Trimmming Bulk Carrier |
|  |  | With Engine / Bridge Aft and fitted with ITF / WWF / AHL. |
|  |  | Vessel is Grain Fitted in Accordance with SOLAS 1974 |
|  |  | and latest amendments without requiring bagging/strapping |
|  |  | /securing when loaded with a full cargo of Bulk Grain. |

|  |  |  |
|---|---|---|
| Built Year / Place | : | 7 / 2001      /   DAEDONG - S.KOREA |
| Ex-name | : | N/A |
| Flag | : | Malta |
| Port of Registry / No | : | Valetta / 7994 |
| Class | : | DNV ( Det Norske Veritas ) |
| Class Notation | : | +1A1 Bulk Carrier ESP HC-E GRAIN-U E0 LCS(SIG) |
|  |  | IB(+) Holds 2, 4 Empty NAUTICUS Newbuilding |
| Class No | : | DNV 22763 |
| Dwt | : | 52,179 MT on 12.319 M Summer Salt Water Draft |
| Light Ship | : | 8,935 MT |
| Grt / Nrt | : | 30,477 / 16,985 MT |
| Suez Canal      Grt / Nrt | : | 31,439.61 / 27,928.04 MT |
| Panama Canal    Grt / Nrt | : | TBA / 26267 MT |
| LOA/Beam | : | 190.00 / 32.26 M |
| Ho/Ha | : | 5 Ho / 5 Ha |

Holdwise Capacity [ Grain / Bale ]

| | [ Grain ] | | [ Bale ] | |
|---|---|---|---|---|
| | CBM | CBF | CBM | CBF |
| Hold # 1 : | 12.731,20 | 449.595,60 | 12.349,30 | 436.109,10 |
| Hold # 2 : | 13.892,70 | 490.613,40 | 13.475,90 | 475.894,30 |
| Hold # 3 : | 13.347,10 | 471.345,80 | 12.946,70 | 457.205,90 |
| Hold # 4 : | 13.877,20 | 490.066,00 | 13.460,90 | 475.364,60 |
| Hold # 5 : | 12.883,00 | 454.956,40 | 12.496,50 | 441.307,30 |
| Ttl Hold Capacity [ Grain / Bale ] | 66.731,20 | 2.356.577,20 | 64.729,30 | 2.285.881,20 |

Height from

Water Line to top of Hatch Coaming :  14.338 M Light Ballast / 11.547 M Heavy Ballast

# GEDEN LINES

## M/V TARSUS

[ REVISED As of  ;  10.JULY.2006 ]          Page    2 of 5

### Specification of Vessel  - Continued

[ All Details About & WOG ]

Holdwise FlatTanktop Dimensions / Height ( Including Hatch Coaming )

|  | | Length | | Breadth [ Fore / Aft ] | | Height |
|---|---|---|---|---|---|---|
| Hold # 1 | : | 29.04 M | x | 8.30 / 23.24 M | x | 18.00 M |
| Hold # 2, | : | 26.40 M | x | 23.24 M | x | 18.00 M |
| Hold # 3 | : | 23.80 M | x | 23.24 M | x | 18.00 M |
| Hold # 4 | : | 26.50 M | x | 23.40 / 22.38 M | x | 18.00 M |
| Hold # 5 | : | 29.00 M | x | 21.955 / 7.5 M | x | 18.00 M |

Hatchcover Type                              : Electro-Hydraulic End Foulding Type

Hatch Size [ Length x Breadth ]

    Hatch # 1                           : 19.36 x 17.32 M

    Hatch # 2, 3, 4, 5                   : 20.24 x 17.32 M

No Bulwarks on Deck

Deck Cargo                                  : No Deck Cargo can be loaded on hatchcovers since Vessel

    is not designed for deck and hatchcover loads

Strength of Tanktop                          :      21,90  MT Per Square Meter

Gears                                        : 4 x 30 Tons SWL [ 24 Ton Grab Operation ] / 26 M Outreach

    From Ship' Side : 9.80 M

    Allowable heel Condition for Crane Work, Ship's Heel : Max 3°

    Cargo Swing Angle Max 2° at the max. Heel of 3°.

Charterers to employ Competant Shore Hands to operate Vsl's cranes  at Chrtrs cost/risk to operate Vsl's cranes.

No craneman from vessel.

Ropes                                        : 10 Ropes on board (60mm x 200 mt each MBL 60,5 Mton)

    Charterers provide and pay for additional rope requirement

Locations of Gears

    Gear # 1                           : Between Hatches # 1 / 2

    Gear # 2                           : Between Hatches # 2 / 3

    Gear # 3                           : Between Hatches # 3 / 4

    Gear # 4                           : Between Hatches # 4 / 5

Grabs                                        : Bleijenberg / 4 Clam bucket  Electro Hydraulic Grabs

    [ Dual Scoop ] x 19 CBM Capacity

    Grabs Can Handle Cargoes Stowing 0.62 cbm / mt or Lighter.

    During Grab Operation Max SWL Is 24 mts.

TPC                                          : 55.3 MT / cm

Constants [ Excluding Fresh Water ]          : 250 MT

Fresh Water Tank Capacity                    : 436 MT

Remaining Ballast Water                      : 40 MTS (Based on the even keel condition, although sounding

    table indicates zero ballast water)

Evaporator Capacity                          : 20 T / Day

Tank Capacity for IFO / MDO [100%]           : 1,888 CBM / 214.4 CBM

Air Draft                                    : 42.718 M Light Ballast / 39.929 M Heavy Ballast

# GEDEN LINES

## M/V TARSUS

[ REVISED As of ; 10.JULY.2006 ]                Page    3 of 5

## Specification of Vessel  - Continued

[ All Details About & WOG ]

| Fuel Consumptions | | | Laden | | | Ballast | | |
|---|---|---|---|---|---|---|---|---|
| MAIN ENGINES | Abt 13.5 Kt | : | 25,5 | MT | IFO [ 180 CST ] | 23,5 | MT | IFO [ 180 CST ] |
| | Abt 14.0 Kt | : | 27,5 | MT | IFO [ 180 CST ] | 25,5 | MT | IFO [ 180 CST ] |
| Plus | | | | | | | | |
| GENERATORS | At Sea | : | 1,7 | MT | IFO [ 180 CST ] | 1,7 | MT | IFO [ 180 CST ] |

Port Consumptions

| | Idle | : | 1.5 / 2 MT MGO |
|---|---|---|---|
| | Gear Working | : | 3 / 4 MT MGO |

[ At Full Summer SW Draft : 12.319 m ]

All Speed and Consumption Figures are to be considered as "About" [ "About" Means+/- 0.5 Knot

for "Speed" And + / - 5 % for "Bunker Consumptions" ]

Vessel' Speed and Consumptions always subject to "Good Weather" and "Smooth Sea Basis No Adverse

Currents and No Swells" and Winds Upto Maximum "Beaufort Force 4" and Maximum "Douglas Seastate 3"

Diesel Generators / Boilers will also burn MGO/DMA during the Starting and Stopping Operation for

an hour or enough time to flush the Fuel Oil System. Also if the load of Main Engines drops less than

60% of MCR, fuel has to be shifted to Diesel Oil instead of Heavy Fuel Oil.

Vessel has liberty to Consume MGO/DMA When Manuevering in Shallow / Narrow / Busy / Confined

and Restricted Waters, Passing from Straits, Canals, Rivers, Berthing / Unberthing, in / out Ports, during

bad weather and Heavy Swells, if required.

| Bunker Specs | : | As per specified in the 4th page of vessel's description. |
|---|---|---|
| Owners P&I Club | : | WEST OF ENGLAND |
| Insured Hull & Machinery Value | : | USD 35,000,000 |
| Last Dry Dock | : | MARCH 2006 |
| Last Special Survey | : | MARCH 2006 |
| Crew Nationality | : | TURKISH |
| Name of the Master | : | CAPT SITKI AĞAR |
| Communication | : | Call Sign : 9HKV7 |
| | | Inmarsat - [ Tel ]: 321 533 310 |
| | | [ Fax ]: 321 533 320 |
| | | [ Telex ] 321 533 340 |
| | | Inmarsat - [ E-m: 421533310@in.mail65.com.sg |

# GEDEN LINES

## M/V TARSUS

[ REVISED As of : 10.JULY.2006 ]

Page 4 of 5

[ All Details About & WOG ]

### Details of Owners

Name of Registered Owners    :   TARSUS SHIPPING LTD.
Name of Disponent Owners    :   GEDEN OPERATIONS LTD. [GOL]
Name of Managers   :   GENEL DENİZCİLİK NAKLİYATI A.Ş. [ GEDEN LINE ]
Address          :   YAPI KREDİ PLAZA  A-BLOK KAT 12, 80620, LEVENT, İSTANBUL / TURKEY
Telephone        :   +90  [212]  283 2888
Fax             :   +90  [212]  283 1604 / 05
E-mail          :   chartering@gedenlines.com
Telex           :   26501 GDE TR / 26503 GEDL TR

### BUNKERS

Charterers hereby confirm and commit that they'll comply to provide / replenish Fuels & Bunkers as described
herebelow in 1, 2, and 3 for throughout the Charter Party Period.

### 1.   BUNKER  SPECS

1).    All bunker fuels to be supplied to be within ISO 8217 - 2005 (E) [ DMA for MGO / RME 180 for IFO 180 CST ]

If RME 25 is not available, Charterer may be allowed to supply RMF 25 only at S.Africa but always
subject to Owners' prior approval. In that case, Charterers to pay the cost of used "Bunker Additive
Chemicals" such as "CP-3500" ( or equivalent ) against Owners' invoice  from  Supplier.

2).    The net calorific value of fuels delivered for main propulsion plant consumption is to have a minimum
value of 40.0 MJ/Kg. Claims arising from under performance of vessel where fuel supplied has a
lower level of energy than 40.0 MJ/Kg, are to be adjusted accordingly to the reduction in net calorific
value from 40.0 MJ/Kg.

3).    All fuels suplied to the vessel shall be derived from standard refinery processes of petroleum crude
oils and are not to include waste materials such as spent lubricating oils and/or chemical waste.

4).    Silicon and Aluminium contents will not exceed 30 mg / kg

5).  a.    Sampling shall be carried out at the ship's receiving manifold by continious drip method.
     b.    Sampling device will be checked and sealed by both parties at the beginning of the bunkering.
     c.    Both parties shall attend to witness breaking the seal at the end of the bunkering.
     d.    Sufficient volume to be taken for splitting into 3 samples dully signed as follows;

          Sample  To be sent to DNV Labaratories.
          Sample  To be given to the Bunker Supplier.
          Sample  To be retained on board of the Vessel.

     e.    Incase of any dispute regarding the result of the sample sent to Labaratory by Owners, then the sample
          retained on board of the vessel to be sent to a Labaratory for a Joint Bunker Analysis agreed by both
          Owners and Charterers ( if possible DNV ). In this case sample to govern quality of the bunkers supplied
          shall be the 3rd sample retained on board of the Vessel.

          The test result of this 3rd Bunker Sample ( which is kept on board of the vessel ), to be binding for all
          parties including density which to be used in calculating the actual Bunkers Quantity information.
          Cost of the All Bunker Anaylysis for the samples to be shared 50 / 50 pct between Owners and Charterers
          unless Charterers fail to provide proper bunkers along with the Charter Party Specs.

          Bunker Supplier and the Charterers can arrange a survey for 2nd Sample kept by the Bunker Supplier
          but this shall not be binding for any party.

# GEDEN LINES

## M/V TARSUS

[ REVISED As of  ;  10 JULY 2006 ]                    Page  5 of 5

### Specification of Vessel  - Continued

[ All Details About & WOG ]

6).        Sodium to Vanadium ratio to be less than 1 : 3

7).        Density at 15 degrees C to be max 0.991

Marine gas oil/distilate fuel must not have a sulphur content of more than 0.20% m/m in accordance with
EU Council Directive ,1999/32/EC when the vessel is entering EU member territorial waters.

## 2.    MARPOL ANNEX VI

Below described definitions shall be applied by Charterers for fuel oil supply of No 1 port and HFO Storage
(port) tanks which are dedicated for low sulphure fuel oil tanks as provision of Marpol Annex VI.
Charterers hereby also Guarantee to comply with all rules & regulations in relation with Marpol Annex VI.

1).    The fuel shall not contain inorganic acid.

2).    The fuel shall not include any added substances or chemical waste which either jeopardises safety
       of ship or the performance of the engine, is harmful to personnel, or contributes to additional air
       pollution. This shall not preclude incorporation of small amounts of additives intended to improve
       some aspects of performance.

3).    The bunker delivery note shall be accompanied by a sample of the fuel delivered, sealed and signed
       by the supplier's representative and master or officer in charge of the bunker operation. The sample
       shall be retained under the ship's control until the fuel is consumed but not for less than twelve
       months after the time of delivery.

4).    The sampling equipment and test procedures shall comply with the DNVPS Guidelines: "Marine
       Fuel Management" based on the standards referred to in Table B1, Sec.1 B408.

5)    SOx emission limits are generally achieved by use of low sulfur content fuel oil. When in port or SOx
       controlled areas, the maximum sulfur content in fuel oil used is 1.5 % S. Changes of fuel type when
       entering and leaving port, or SOx controlled areas shall be documented by entries in the ship's
       logbook.

6).    The emission criteria specified for oil fired boilers.

7).    SOx emission controlled areas shall include:
       a.    The Baltic Sea areas as defined in Marpol 73/78/97 regulation 10(1)b of Annex I; and
       b.    Any other area, including port areas, designated by the Organization in accordance with criteria
             and procedures for designation of SOx emission controlled areas with respect to the prevention
             of air pollution from ships contained in appendix III to this Annex (Marpol 73/78/97 Annex VI)

## 3.    OTHERS

If there will be any further alterations/amendments other than above, Charterers shall immediately take
necessary steps without any notice from Owners. The Owners shall in no case liable for any time losses /
expenses / costs / consequences / speed reductions / over consumptions etc / whatsoever as a result of
Charterers failure due to not supply the bunker in accordance with the calling port/place authorities
regulations / rules / circulars etc.

# GEDEN OPERATIONS LTD. [GOL]

## TRADING EXCLUSIONS

[ REVISED on  5-April-2005 ]

### TRADING COUNTRY EXCLUSIONS;

WORLDWIDE TRADING WITHIN INSTITUTE WARRANTY LIMITS.
THE VESSEL NOT TO FORCE ICE, NOT TO TRADE IN ICEBOUND WATERS, NOR TO FOLLOW ICE BREAKERS.
THE VESSEL SHALL BE EMPLOYED ALWAYS VIA SAFE BERTHS, PORTS, ANCHORAGES, AND SAFE ICE FREE BERTHS,
PORTS, ANCHORAGES, ALWAYS SAFELY AFLOAT AND ACCESSIBLE, EXCLUDING FOLLOWING:

I. COUNTRIES EXCLUDED BY OWNERS THROUGHOUT THE CHARTER PARTY PERIOD

1 . ALASKA
2 . ANGOLA [ INCLUDING CABINDA ]
3 . ARAB LEAGUE BOYCOTTED COUNTRIES
4 . CAMBODIA
5 . CIS PACIFIC PORTS
6 . CONGO, DEMOCROTIC REPUBLIC OF (FORMERLY ZAIRE)
7 . CUBA,
8 . CYPRUS, GREEK SIDE
9 . ERITREA
10 . HAITI
11 . IRAQ
12 . ISRAEL
13 . LIBERIA
14 . NORTH KOREA
15 . SOMALIA
16 . SIERRA LEONE
17 . YEMEN / PEOPLES REP OF YEMEN [NORTH & SOUTH], INCLUDING THE STRAITS OF BAB EL MANDAB
18 . ALL COUNTRIES, ZONES, AREAS WHERE UN IMPOSES TRADE SANCTIONS BANNED BY UN. FROM
     TIME TO TIME

II. COUNTRIES / AREAS WHICH ARE EXCLUDED BY OWNERS' UNDERWRITERS DURING C/P PERIOD

ANY ADDITIONAL WAR RISK PREMIUM CHARGED BY VESSEL ' HULL AND MACHINERY UNDERWRITERS TO BE
FOR CHARTERERS' ACCOUNT. HOWEVER SUCH AMOUNT NOT TO EXCEED WHAT WOULD HAVE BEEN CHARGED
BY LLOYD'S OF LONDON.

III. PROHIBITION OF DIRECT TRADE

1 . CHARTERERS NOT TO TRADE VESSEL DIRECTLY WITH PEOPLES REPUBLIC OF CHINA AND TAIWAN WITHOUT
    CLEARANCE WHICH ALL COSTS TO BE CHARTERERS'S ACCOUNT.

IT'S AGREED THAT BIMCO CONWARTIME 2004 CLS TO APPLY